**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ANSUR AMERICA INSURANCE COMPANY, a Michigan Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 3:21-CV-59-SMY-MAB |
| JAMES A. BORLAND and QUINN, JOHNSTON, HENDERSON & PRETORIOUS, CHTD., an Illinois corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court as a result of a discovery dispute between Plaintiff Ansur America Insurance Company ("Ansur") and Defendants James Borland and Quinn, Johnston, Henderson, & Pretorious, Chtd (collectively, "Defendants"). Specifically, Defendants filed a motion to compel the production of a large number of documents that Ansur has withheld on the basis of various privileges (*see* Doc. 95).[1]

For the reasons set forth below, Defendants' motion to compel is GRANTED IN PART and DENIED IN PART (Doc. 95). Additionally, as discussed below, the Court ORDERS the parties to meet and confer so they may: (1) work together to determine which privilege claims remain outstanding in light of the Court's decision; and (2) attempt to reach an agreement as to the remaining documents and communications.

---

[1] This matter was referred to the undersigned for resolution of Defendants' motion to compel (Doc. 97).

<u>B<small>ACKGROUND</small></u>

Ansur hired Defendants to defend its insured, Clawfoot Supply, LLC d/b/a Signature Hardware ("Signature"), in a product liability action brought against Signature by two of its retail customers, Helen and Wayne Miles (hereafter, the "Miles litigation") (Doc 1, p. 1; Doc. 95, p. 1; Doc. 125, p. 2). Defendants led Ansur to believe they could either obtain a defense verdict or a favorable settlement in the Miles litigation (Doc. 1, p. 2). However, Ansur alleges Defendants failed to defend the case in a reasonable manner, which forced Ansur to settle for the policy limit, a substantially higher figure (Doc. 1, p. 2; Doc. 95, p. 1). As a result, Ansur initiated this action against Defendants, alleging malpractice in connection with the Miles litigation (*see generally* Doc. 1). In response, Defendants argue Ansur contributed to its own injury (Doc. 19, pp. 42-43).

The parties engaged in extensive written and oral discovery (*see generally* Docs. 95; 125). However, Ansur withheld hundreds of documents and communications and redacted numerous others based primarily upon the attorney-client privilege and work product privilege (Doc. 95, p. 2; Doc. 125, p. 3). Accordingly, Defendants filed the instant motion to compel, which seeks the production of several hundred withheld or redacted documents (Doc. 95; *see also* Doc. 111-1 (listing the documents Defendants dispute Ansur's privilege claims); Doc. 111-2 (the most recent comprehensive privilege log)). Thereafter, Ansur filed a response in opposition (Doc. 125) and Defendants filed a reply in support of production (Doc. 128). Throughout this dispute, the parties have met and conferred several times in an attempt to resolve or narrow their extensive discovery dispute and the Court has intervened on multiple occasions (*see* Docs. 101; 133). However,

based upon the parties most recent representations to the Court, the parties have reached an impasse and are unable to resolve the current discovery dispute without judicial intervention (*see* Doc. 133).

Additionally, in an attempt to streamline the resolution of this discovery dispute, the Court ordered the parties to file supplemental letter briefs with the Court that addressed several key issues raised by the parties in their briefs including: (1) whether certain individuals should be considered members of Ansur's control group; (2) whether Ansur and its reinsurers share a common legal interest; and (3) whether Ansur waived its privilege claims to any documents by placing their contents at issue (Doc. 134). Both parties timely submitted the requested supplemental briefs.

## PRIVILEGE STANDARDS

As a civil action brought before this Court pursuant to its diversity jurisdiction, Illinois law regarding attorney client-privilege governs. *See* Fed. R. Evid. 501; *see also Hartford Fire Ins. Co. v. PLC Enterprises, Inc.*, 1994 WL 148664, at *2 (N.D. Ill. Apr. 21, 1994) (applying Illinois law under similar circumstances). Illinois courts maintain a broad discovery policy in favor of disclosure and ascertaining the truth. *See Archer Daniels Midland Co. v. Koppers Co.*, 485 N.E.2d 1301, 1303 (Ill. App. 1985). "The courts, therefore, narrowly construe the attorney-client privilege in order to avoid trammeling upon the broad discovery policy." *Id.* "Consequently, the burden of showing facts which give rise to the privilege rests on the proponent." *Knief v. Sotos*, 537 N.E.2d 832, 835 (Ill. 1989). This means "the proponent must show that the communication was made with an

understanding that it would not be disclosed, that it has remained confidential, and was made to an attorney for the purpose of securing legal advice or service." *Id.*

Additionally, when a corporate client invokes the attorney-client privilege, "the corporation must go beyond these threshold requirements and show that the employee involved falls within the control group of the corporation, as defined in *Consolidation Coal*." *Archer Daniels*, 485 N.E.2d at 1303 (citing *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 432 N.E.2d 250 (Ill. 1982)). The control group test creates two tiers of corporate employees whose communications may be protected by the privilege. *Id.* "The first tier consists of the decision-makers, or top management. The second tier consists of those employees who directly advise top management, and upon whose opinions and advice the decision-makers rely." *Mlynarski v. Rush Presbyterian-St. Luke's Med. Ctr.*, 572 N.E.2d 1025, 1028 (Ill. App. 1991). In other words, for an employee's communications to fall within the second tier of the control group, that employee must hold an advisory role to top management in a particular area:

> [S]uch that a decision would not normally be made without his advice or opinion, and whose opinion in fact forms the basis of any final decision by those with actual authority, is properly within the control group. However, the individuals upon whom he may rely for supplying information are not members of the control group. Thus, if an employee of the status described is consulted for the purpose of determining what legal action the corporation will pursue, his communication is protected from disclosure.

*Consolidation Coal*, 432 N.E.2d at 258. Critically, the Illinois Supreme Court has emphasized that an employee only falls into the second tier if their "opinion" is relied upon by decisionmakers, not if the underlying facts and information they provide is

relied upon by decisionmakers. *See id.*; *Doe v. Twp. High Sch. Dist. 211*, 34 N.E.3d 652, 673 (Ill. App. 2015).

In addition, certain documents may be appropriately withheld from production based upon the work product doctrine, which protects documents prepared by attorneys in anticipation of litigation for the purpose of analyzing and preparing a client's case. *See Nat'l Fire & Marine Ins. Co. v. Lindemann*, 2018 WL 6505900, at *2 (S.D. Ill. Jan. 31, 2018); Ill. Sup. Ct. Rule 201(b)(2) ("Material prepared by or for a party in preparation for trial is subject to discovery only if it does not contain or disclose the theories, mental impressions, or litigation plans of the party's attorney."). However, "[b]ecause the attorney-client privilege and work-product doctrine obscure the search for the truth, both should be confined to their narrowest possible limits to minimize the impact upon the discovery process." *Ziemack v. Centel Corp.*, 1995 WL 314526, at *2 (N.D. Ill. May 19, 1995).

Significantly, "[d]istribution of otherwise privileged material to individuals outside of the control group destroys the privilege." *Midwesco-Paschen Joint Venture For Viking Projects v. Imo Indus., Inc.*, 638 N.E.2d 322, 329 (Ill. App. 1994). However, one limited exception to this rule is the common interest doctrine. *See Dexia Credit Loc. v. Rogan*, 231 F.R.D. 268, 272-73 (N.D. Ill. 2004) (noting that the legal principles governing the application of this doctrine appear to be the same under Illinois and federal law). As explained in *Dexia*, the common interest doctrine serves to foster communication between parties that share a common interest by allowing communications between the parties to remain privileged. *Id.* at 273. To maintain a privilege under this doctrine, the asserting party must first demonstrate that the underlying documents or communications were

shielded from production based upon an underlying privilege, and then demonstrate "'actual cooperation toward a common legal goal' with respect to the documents they seek to withhold." *Id.* (quoting *Strougo v. BEA Assoc.*, 199 F.R.D. 515, 520 (S.D.N.Y. 2001)). Furthermore, the "shared interest must be identical, not simply similar." *Id.*

Finally, even if a document or communication is privileged, the privilege is waived if the withholding party has placed the document or communication "at issue." *W. States Ins. Co. v. O'Hara*, 828 N.E.2d 842, 850 (Ill. App. 2005). Typically, this type of waiver occurs "where the sought-after material is either the basis of the lawsuit or the defense thereof." *Waste Mgmt., Inc. v. Int'l Surplus Lines Ins. Co.*, 579 N.E.2d 322, 331 (Ill. 1991); *Shapo v. Tires 'N Tracks, Inc.*, 782 N.E.2d 813, 819 (Ill. App. 2002) (noting that the "at issue" waiver applies to both the attorney-client privilege and work-product privilege). Understandably, "[t]he purpose of the doctrine is to prevent a party from strategically and selectively disclosing partial attorney-client communications with his attorney to use as a sword, and then invoking the privilege as a shield to other communications so as to gain a tactical advantage *in litigation*." *Ctr. Partners, Ltd. v. Growth Head GP,* 981 N.E.2d 345, 362 (Ill. 2012) (emphasis in original).

### DISCUSSION

A. *Control Group Members*

Defendants dispute whether numerous individuals listed on Ansur's privilege log are control group members (Doc. 95, pp. 6-8). Significantly, for the individuals discussed below that the Court determines are not members of the control group, Ansur is required to turn over any documents or communications to which they are listed on (whether they

sent or received the communication directly or were cc'ed or bcc'ed). *See Midwesco-Paschen Joint Venture*, 638 N.E.2d at 329 ("Distribution of otherwise privileged material to individuals outside of the control group destroys the privilege."). For simplicity's sake, the Court addresses each challenged member individually.

### 1. *Andrew Knudsen*

In 2019, Andrew Knudsen served as the vice president for claims at Ansur/Frankenmuth Insurance (Doc. 125-3, pp. 5-6).[2] Based upon the affidavit submitted by Knudsen, as the vice president for claims, Knudsen shared ultimate responsibility for settling the Miles litigation and oversaw the other cases related to the Miles litigation (*Id.*). As such, Ansur has established that Knudsen was a member of the first tier of Ansur's control group.

### 2. *James Troester*

James Troester served as a litigation manager in the claims department (Doc. 125-3, pp. 9-10). In this role, Troester was responsible for overseeing all non-worker's compensation litigation involving Ansur's insured parties, which included the Miles litigation and its related cases (*Id.*). For these reasons, Ansur has also demonstrated that Troester was a member of the first tier of Ansur's control group.

### 3. *John Rosilier*

John Rosilier was the former chief financial officer at Ansur (Doc. 125, p. 8; Doc. 128, p. 2). Critically, however, Ansur has failed to provide any explanation as to why

---

[2] Frankenmuth Insurance is Ansur's parent company.

Rosilier should be considered a control group member based solely upon his title as chief financial officer.

Rather than submit an affidavit or other evidence demonstrating Rosilier's role in the decision-making process, Ansur instead argues "Defendants have not identified any authority suggesting that a company's C-Suite executives are not 'top management' or decision-makers." (Doc. 125, p. 8). This argument misses the mark for two reasons. First, it is Ansur's burden to demonstrate that Rosilier was a control group member – not Defendants' burden to prove he was not. *See, e.g.*, *Midwesco-Paschen*, 638 N.E.2d at 330 ("Imo misunderstands who has the burden of proof when it argues that '[Midwesco] failed to submit even a shred of evidence that refutes Imo's [privilege] claim concerning the materials prepared by Schifler.'"); *Knief*, 537 N.E.2d at 835. Second, being a senior executive does not automatically qualify an individual as a control group member in all areas. *See Claxton v. Thackston*, 559 N.E.2d 82, 86 (Ill. App. 1990) ("Although the affidavit states MacGregor was a corporate director, Mayer does not cite authority for the proposition that directors are ipso facto members of the control group. Nor did Mayer present any evidence about the actual decision making power of the only non-family director in Mayer family firm."); *Knief*, 537 N.E.2d at 835.

Consequently, by failing to provide any evidence or explanation as to Rosilier's role as a decisionmaker in this situation, Ansur has failed to meet its burden and demonstrate that Rosilier was a control group member whose communications were privileged. As such, communications involving Rosilier are not privileged.

4. *Aaron Weycker*

Aaron Weycker worked as Ansur's assistant controller until September 2019 (Doc. 125-3; pp. 11-12). Thereafter, Weycker served as the director of accounting and finance (*Id.*). Specifically, as an assistant controller, Weycker states he advised the previous director of accounting and finance on all issues related to the company's accounting operations, including large losses like that in the Miles litigation (*Id.*). Weycker also states he was responsible for overseeing the impact of the Miles litigation and its related litigation on the company's books and records. Accordingly, Ansur argues Weycker was a second-tier control group member until September 2019, at which time he then become a first-tier control group member (Doc. 125, pp. 8-9).

Ultimately, the Court is not persuaded by Ansur's arguments. Again, the burden is on Ansur to demonstrate that its decisionmakers relied upon Weycker's advice as it relates to the Miles litigation. *See Archer Daniels*, 485 N.E.2d at 1303-04. However, excluding Weycker's affidavit, none of the other affidavits from Ansur's employees state that Weycker's input was relied on in any regard (*see generally* Doc. 125-3). While this could be inconsequential if Weycker's affidavit sufficiently demonstrated his status as a control group member, Weycker's affidavit does not do so. Instead, Weycker's affidavit only demonstrates that his advice was relied upon for issues related to large losses and for "overseeing the impact of the Miles suit." Crucially, overseeing the impact of a lawsuit is not the same as overseeing the lawsuit itself. For this reason, Ansur has not adequately explained how Weycker's role in overseeing the financial impact of litigation on Ansur's books and records involved providing advice that was relied upon when deciding what

legal actions Ansur should pursue. *See Consolidation Coal*, 432 N.E.2d at 258 ("Thus, if an employee of the status described is consulted for the purpose of determining what legal action the corporation will pursue, his communication is protected from disclosure.").

Additionally, Ansur's barebones assertions that Weycker was a first-tier control group member following his promotion to director of accounting and finance are insufficient. *See Claxton*, 559 N.E.2d at 86. As with Rosilier, Ansur merely relies on Weycker's new title as proof that he was involved in decision-making without providing any evidence demonstrating that the director of accounting and finance would necessarily be a decisionmaker in the Miles litigation.

For these reasons, the Court finds Ansur has failed to meet its burden and demonstrate that Weycker was a control group member. As such, communications involving Weycker are not privileged.

### 5. *Matthew Zielke*

In 2019, Matthew Zielke served as a senior litigation examiner in the claims department (Doc. 125-3, p. 13). Zielke was brought onto the Miles litigation after it was reported that the value of litigation had dramatically increased (*Id.*). Zielke's affidavit states that he became a key figure in overseeing coverage aspects of the Miles litigation and senior leadership relied upon his advice when making decisions surrounding the Miles litigation (*Id.*). For these reasons, Ansur has demonstrated that Zielke was a member of the second tier of Ansur's control group *after* his assignment to the case in May 2019.

6. *Craig Hebert*

Craig Hebert also served as a senior litigation examiner in the claims department (Doc. 125-3, p. 2). However, while Hebert was initially the primary employee responsible for handling the Miles litigation, he lost his authority to settle the case in May 2019, when its valuation changed (*Id.*). Hebert states he continued to advise management after losing his authority, but he also notes that he was "most knowledgeable about the facts of the case[.]" (*Id.*). Additionally, Troester's affidavit states that Hebert advised him during the course of the Miles litigation and that they discussed "factual findings, advice of counsel, and strategy[.]" (Doc. 125-3, p. 10).

When determining whether an individual is a member of the control group's second tier, a critical distinction exists between individuals who provide opinions that "substantially influenced decisions" and individuals who provide facts and technical analysis which "substantially influenced decisions." *See Archer Daniels*, 485 N.E.2d at 1304. Only individuals whose opinions would in fact form the basis for any decision by decisionmakers within the company are part of the control group. *See Claxton*, 559 N.E.2d at 86. Put another way, "[e]mployees not within the control group include those whom top management merely relies upon for supplying information." *Archer Daniels*, 485 N.E.2d at 1304. Consequently, Illinois courts have found the record to be insufficient to establish that an individual was a member of the control group when the record did "not specify if he had an advisory role in top management, whether a decision in this area would normally not be made without his advice, or whether his opinion would in fact form the basis for any decision by others with authority in the company." *Id.*

Prior to losing his authority to settle the case in May 2019, Hebert was undoubtedly a member of the control group based upon his decision-making authority. However, after losing that authority, Hebert was relied upon primarily for his factual recollection of the case (*see, e.g.*, Doc. 125-3, p. 2). Specifically, Hebert's affidavit states that as "the person most knowledgeable about the facts of the case and most familiar with its history, I continued to advise my superiors on aspects of the case and afterward, as Frankenmuth pursued actions against the manufacturer and the insured" (*Id.*). In other words, while Hebert (and Troester) both state that he continued to advise Ansur's decisionmakers, neither affidavit demonstrates that Hebert's opinions "in fact form[ed] the basis of the final decision by those with actual authority." *Archer Daniels*, 485 N.E.2d at 1303-04. In truth, Hebert's affidavit does not even demonstrate that he was still assigned to the case following its changed valuation. Similarly, even if Hebert's and Troester's affidavits provided evidence demonstrating that Ansur's decision-makers actually relied upon Hebert for more than just factual explanations, Ansur has not demonstrated that "top management would normally not make a decision in the employee's particular area of expertise without the employee's advice." *Rounds v. Jackson Park Hosp. & Med. Ctr.*, 745 N.E.2d 561, 568 (Ill. App. 2001).

For these reasons, the Court finds Hebert was not a member of Ansur's control group following the case's change in valuation. Accordingly, any communications or documents sent from or to Hebert after he lost his settlement authority in May 2019 are not privileged and must be produced.

### 7. *Matthew Klinski*

In 2019, Matthew Klinski worked as a technical coordinator for claims operations (Doc. 125-3, pp. 3-4). Klinski was brought onto the Miles litigation after it was reported that the case value had increased significantly (*Id.*). In this role, Klinski served as a primary liaison to malpractice counsel and advised Ansur decisionmakers on various aspects of the case (*Id.*). For these reasons, Ansur has demonstrated that Klinski was a member of the second tier of Ansur's control group after his assignment to the case in May 2019.

### 8. *Mackenzie Sipes, Katrina Smithhart, Diane Kueffner, & Jennifer Moore*

Lastly, the parties dispute whether communications involving Mackenzie Sipes, Katrina Smithhart, Diane Kueffner, and/or Jennifer Moore may be privileged. In regard to these individuals, Ansur does not contend that any of them were in the control group. Instead, Ansur argues they acted in a secretarial role and therefore fall within a ministerial exception to the general rules regarding the confidentiality of privileged communications (Doc. 125, pp. 9-10).

Significantly, the ministerial exception allows for communications to remain privileged even though they involve an individual outside the control group when that individual is acting in the role of a clerk, secretary, or stenographer, and is facilitating the transmission of a communication between a client and their attorney. *See Abbott Lab'ys v. Airco, Inc.*, 1985 WL 3596, at *4 (N.D. Ill. Nov. 4, 1985); *Janousek v. Slotky*, 980 N.E.2d 641, 653 (Ill. App. 2012) (Explaining that "a communication through any form of agency used by the client falls within the privilege."). For instance, in *Abbott Laboratories*, the court

found communications authored by a secretary remained privileged because "[a]ll of the documents indicate that [the secretary] authored the notes at the behest of [a control group member] seeking legal advice, or [their attorney] imparting legal advice." 1985 WL 3596, at *4.

At this juncture, the Court has not yet individually reviewed the communications involving these individuals and thus is unable to determine whether the communications were made on behalf of either a control group member or counsel and were otherwise privileged because they involved legal advice or attorney work product. While an *in camera* review of these communications may be required, before doing so, the Court directs Ansur to carefully review the communications involving these individuals to ensure they were acting as ministerial agents by facilitating the transmission of a privileged communications to control group members. The Court is doubtful that the ministerial exception will apply to communications where the secretarial agent was the receiving party of an email (or merely cc'ed) and not its author. Indeed, in situations where a secretary is included as an email recipient but neither the email itself nor the privilege log demonstrates why and how their inclusion facilitates the transmission of a privileged communication or document to a specific control group member, Ansur has failed to meet its burden and the Court will not find the ministerial exception to be applicable. If an *in camera review* is necessary after complying with the Court's directive and in light of the above analysis, the Court will conduct one.

B. *Reinsurer Common Interest*

Defendants next argue that Ansur must produce numerous documents that were shared between Ansur and its reinsurers because they were not kept confidential and were not protected by the common interest doctrine (Doc. 128, pp. 3-5). Conversely, Ansur argues it shared an identical interest with its reinsurers and therefore, the privilege was not lost by their sharing of documents (Doc. 125, p. 10).

As previously explained, the common interest doctrine is not actually a privilege in and of itself. Instead, the doctrine extends a preexisting "privilege to communications made in the presence of third parties for the purpose of coordinating a defense strategy or pooling information for common legal purpose." *Terra Found. for Am. Art v. Solomol+Bauer+Giambastiani Architects, Inc.*, 2015 WL 1954459, at *4 (N.D. Ill. Apr. 29, 2015). The party withholding documents based upon the common interest doctrine bears the burden of establishing the common interest and the underlying privilege. *Id.* For example, in *Minnesota Sch. Boards Ass'n Ins. Tr. v. Emps. Ins. Co. of Wausau*, 183 F.R.D. 627, 631 (N.D. Ill. 1999), the court was tasked with determining whether a party waived the work product privilege by sharing several otherwise privileged documents with a reinsurer or reinsurance broker.[3] After first determining that the documents at issue were protected by the work product privilege, the court then held that "[t]here has been no waiver herein, since [the party asserting the privilege], *as seen*, always intended and

---

[3] The parties debated whether the receiving company was a reinsurer or reinsurance broker. Ultimately, however, the court found the difference to be inconsequential because the disclosure of the privileged material was consistent with the purpose of maintaining the secrecy of the privileged information. *Minnesota Sch. Boards*, 183 F.R.D. at 631.

expected that their communications would remain confidential and protected from common adversaries[.]" *Id.* at 631-32 (emphasis added).

Here, the Court is unable to determine whether the common interest doctrine is applicable without first examining the communications and documents to determine whether an underlying privilege exists. *See id.* However, assuming an underlying privilege does exist, Ansur has submitted affidavits demonstrating the common legal interest between Ansur and its reinsurers (*see* Docs. 54-1; 54-2; 54-3; 54-4). Moreover, the Court is not persuaded by Defendants' arguments that Ansur and its reinsurers do not share a common legal interest because Ansur's reinsurers do not run the risk of legal liability (Doc. 128, p. 5). Ultimately, Ansur and its reinsurers share a common legal interest in holding Defendants liable for their alleged malpractice and recovering their losses. *See Dexia*, 231 F.R.D. at 273 ("In some cases, this common goal includes pursuit of litigation against a common adversary."); *Selby v. O'Dea*, 90 N.E.3d 1144, 1162 (Ill. App. 2017) (Stating that parties with a common interest need not have perfectly aligned interests. Rather, "[a]s long as the communications further the common interest between the parties, it is of no import that the parties' positions might be otherwise misaligned."). Additionally, while the common interest cannot be a mere business interest, "[i]f there is some or even substantial overlap between the litigation and business interests, the common interest doctrine still applies so long as a 'community of interest' can be established with respect to the documents." *Dexia*, 231 F.R.D. at 273.

However, as with the prior section, the Court directs Ansur to review the documents it claims are protected under this doctrine in light of the Court's rulings herein

to determine whether they involve privileged attorney-client communications or work product. Specifically, when asserting the attorney-client privilege as the underlying privilege, Ansur must also ensure the "communication was made with an understanding that it would not be disclosed, that it has remained confidential, and was made to an attorney for the purpose of securing legal advice or service." *Knief*, 537 N.E.2d at 835. In other words, Ansur must review the communications at issue to ensure they pertain to securing legal advice and were intended to be confidential. Communications Ansur claims are protected by its common interest with reinsurers will not be considered privileged if they are only related to finance or other insurance matters and are not related to legal advice and a joint legal strategy. Additionally, the common interest doctrine would not be applicable if the communications are merely non-privileged discussions between Ansur employees related to reinsurance. For example, Ansur claims an email is privileged because it contains "information protected by common interest with reinsurers" (Doc. 111-2, p. 32 at Priv. No. 293). However, Ansur's privilege log: (1) demonstrates that the communication was not sent to or from an attorney or reinsurer and; (2) provides no explanation as to why there is an underlying attorney-client privilege. Consequently, Ansur must carefully review the communication to determine if it was "made in connection with the provision of legal services" and was not just discussing the availability of reinsurance.[4] *Terra*, 2015 WL 1954459 at *3. Again, after

---

[4] Notably, while the Court has referenced the above email as an example, the Court reiterates that Ansur must conduct this review for all such communications it claims remain privileged due to the common interest doctrine.

complying with the Court's directive, the Court will conduct an *in camera review* as necessary.

C. *"At Issue" Waiver*

Defendants claim Ansur waived any claims of privilege as to the documents in dispute because it placed them at issue by filing this action, which necessarily requires an examination of Ansur's own actions (Doc. 95, pp. 8-9). In response, Ansur argues no such waiver has occurred because it was only Defendants' defense that injected such issues into the case (Doc. 125, pp. 12-13). For the following reasons, the Court agrees with Ansur and finds Ansur has not placed the challenged documents at issue by filing this action.

The Supreme Court of Illinois addressed a similar challenge in *Fischel & Kahn, Ltd. v. van Straaten Gallery, Inc.*, 727 N.E.2d 240 (Ill. 2000). In *Fischel*, an art gallery retained a law firm to provide legal advice related to limiting its liability to consignment artists in the event of damage or destruction to their artwork. *Id.* at 241. A fire subsequently broke out at the art gallery, which resulted in the gallery suing the building's owner. *Id.* Notably, several of the consignment artists whose work was damaged intervened and brought claims against the gallery related to the destruction of their artwork. *Id.* The gallery then hired a different legal group to represent it in the fire litigation. *Id.* Subsequently, the gallery's first law firm sued the gallery to recover unpaid legal fees. *Id.* at 242. The gallery responded by bringing a counterclaim against the law firm, alleging the law firm negligently provided the gallery with erroneous advice regarding limiting the gallery's liability to consignment artists. *Id.* In responding to the gallery's

counterclaim, the law firm raised several affirmative defenses, including that the gallery was contributorily negligent. *Id.* The law firm filed a request for production of documents from the gallery's new lawyers related to the fire litigation and the gallery objected. *Id.*

The question before the Supreme Court of Illinois was whether the gallery waived its privileges related to the disputed documents by filing a counterclaim against the law firm. *Id.* at 243. Pertinently, the court found the gallery did not waive its privileges because it was the law firm's affirmative defense which put the documents at issue, not the gallery's counterclaim. *Id.* at 243-244. The court explained that "[t]o allow [the law firm] to invade the attorney-client privilege with respect to subsequently retained counsel in this case simply by filing the affirmative defenses it did would render the privilege illusory with respect to the communications between [the gallery] and [subsequently retained counsel]. Thus, we believe that the allegations raised in [the law firm's] affirmative defenses were insufficient to put the cause of [the gallery's] damages at issue, resulting in waiver of the attorney-client privilege in this case." *Id.* at 244. Consequently, it would be impermissible to force the gallery to waive its privilege when it had not put the requested documents at issue. *Id.*

Similarly, in this case it was Defendants' affirmative defense that Ansur contributed to its own injury that put these documents at issue. Had Defendants never raised such a defense, the resolution of Ansur's legal claim would not have required an examination of the disputed documents and communications. Therefore, assuming such documents are appropriately protected by a privilege, it would undermine the purposes

of the attorney-client and work product privileges to find Ansur waived its privileges here when it was Defendants who put the communications at issue. *See id.* at 245-46.

D. *Sufficiency of Privilege Log and Order to Meet and Confer*

Finally, Defendants' motion to compel also challenges the sufficiency of Ansur's privilege log (Doc. 95, p. 3). Defendants are correct that some courts have found privilege logs to be insufficient when they are either untimely or provide little to no description to allow a reader to assess the claimed privilege. *See Surgery Ctr. at 900 N. Michigan Ave., LLC v. Am. Physicians Assurance Corp., Inc.*, 317 F.R.D. 620, 632-33 (N.D. Ill. 2016). However, in contrast to those cases, a cursory review of the privilege log created by Ansur in this case appears to demonstrate enough information to assess each privilege claim. Accordingly, the Court declines to categorically declare the privilege log deficient.

At this stage of the discovery dispute, the Court is not inclined to review every individual entry to determine whether it comports with the appropriate standard and provides sufficient information to establish a claim of privilege. Rather, if Defendants have an issue with specific entries, they can identify those specifically to Ansur and ultimately to the Court, if necessary.

## CONCLUSION

Defendants' motion to compel is **GRANTED IN PART** and **DENIED IN PART** (Doc. 95). Ansur is **DIRECTED** to conduct further review of its documents as outlined above. Additionally, as discussed above, the Court **ORDERS** the parties to meet and confer, in light of the Court's rulings above, to determine which documents remain subject to dispute. The Court encourages the parties to work together to resolve any and

all remaining document disputes. However, at a minimum, the Court expects the parties to significantly narrow the number of documents in dispute that may require an *in camera* review.

The parties shall provide a joint status report to the Court within 21 days regarding their meet and confer efforts. And upon receipt of the status report, the Court will schedule a status conference, if necessary.

IT IS SO ORDERED.

DATED:  October 23, 2023

s/ Mark A. Beatty
MARK A. BEATTY
United States Magistrate Judge